FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JUN 23 PM 3: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| GLENN HOLINESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 97-BU-2983-S |
| | ) | |
| MOORE-HANDLEY, INC., | ) | ENTERED |
| | ) | |
| Defendant. | ) | JUN 23 1999 |
| | ) | |

Memorandum Opinion

Plaintiff Glenn Holiness filed this action on November 7, 1997, claiming that his former employer, Defendant Moore-Handley, Inc. ("Moore-Handley"), engaged in discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a & 2000e et seq. ("Title VII"), and in violation of 42 U.S.C. § 1981 ("section 1981"). Now before the Court is a motion for summary judgment filed by Moore-Handley on March 17, 1999. (Doc. 14). The motion is accompanied by a brief and evidence in support of the motion. Holiness has filed evidence and submitted a brief in opposition to the motion. Moore-Handley has also filed a motion to strike certain declaration testimony filed by Holiness in opposition to the motion for summary judgment. (Doc. 23). The motions are now ripe for decision, and, upon due consideration, the Court concludes that the motion for summary judgment is due to be GRANTED and the motion to strike is due to be DENIED AS MOOT.

## I. FACTS[1]

Glenn Holiness is a black male, and he was employed by Moore-Handley, a corporation that sells hardware and building supplies at wholesale and retail. Moore-Handley is based in Pelham, Alabama, and employs over 400 employees. Holiness had two periods of employment with Moore-Handley, only the second of which is at issue in this case. Holiness worked in Moore-Handley's warehouse in Pelham as an inventory order worker from May 18, 1992 until January 3, 1995, at which time he voluntarily resigned to pursue other employment opportunities. Nine months later, on September 21, 1995, Holiness returned to work for Moore-Handley, again in the capacity of a warehouse inventory order worker.

On April 22, 1996, Holiness was promoted to a position as a Commodities Salesman. In his capacity as a Commodities Salesman, Holiness acted as a kind of broker, telephoning Moore-Handley's regular customers daily to obtain purchase orders on various building materials and then calling vendors to fill each order at the lowest possible price. The decision to promote Holiness to this position was made by Mike Hardin, Moore-Handley's Manager of Building Materials, and approved by Hardin's superior, Robert Tolbert, the Director of Marketing. Holiness was initially under the supervision of Hardin, but about three or four weeks after Holiness was promoted Hardin moved to another position at Moore-Handley, and he was replaced as Manager of Building Materials by Ed Plemons, who then became Holiness's supervisor.

While employed at Moore-Handley, Holiness developed a casual friendship with Alysia Housey, a white female co-employee who worked in Moore-Handley's printing or advertising department. In opposition to the motion for summary judgment, Holiness filed a declaration

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

made by Housey, in which she states that her supervisor, Ann Lewis, would warn her that she could lose her job because of her association with Holiness and that Lewis "would make comments about management perception and how Robert Tolbert and Ed Plemons didn't like [Housey's] association with Glenn Holiness."[2] Housey also claims that Tolbert "confronted" her once about having a conversation with another black male co-employee, with Tolbert asking Housey how she knew the employee and "several other personal questions" and then ordering her back to work. Housey asserts that she was not subjected to such behavior when talking to white males.

Upon receiving his first paycheck for his work as a Commodities Salesman on May 31, 1999, Holiness noticed what he considered to be a discrepancy between the amount of his actual salary and the amount he believed he would be receiving. Holiness claims that on April 11, 1996, Hardin offered him the Commodities Sales position and told him that the starting salary was $20,000 per year. However, after receiving his first paycheck Holiness calculated that his compensation would be only $18,000 per year. On June 3, 1996, Holiness checked with the personnel department, and he discovered that his file showed that he was indeed receiving the lower amount. Holiness went to Hardin and asked why he was not receiving the $20,000 salary Hardin told him accompanied the Commodities Sales job. Hardin took a confrontational stance, disavowing that he told Holiness that he would make $20,000 per year and asking Holiness if he was threatening him. Holiness denied that he was making any threats and stated that he simply wanted to be paid the salary he was promised. Holiness left Hardin's office and then went to Plemons and complained, but to no avail.

According to a memorandum dated June 19, 1996 that Plemons placed in Holiness's personnel file, eight customers and two vendors requested that Holiness not be involved in

---

[2]Moore-Handley's has moved to strike this portion of Housey's declaration, in which she claims Lewis told her that Tolbert and Plemons did not like Housey's association with Holiness. The Court will address this motion later in this opinion.

their transactions with Moore-Handley, based upon complaints that Holiness lacked knowledge of building products and that on the phone he addressed them in overly-familiar terms such as "Love," "Babe," and "Bud." It also appears from that memorandum and another dated June 27, 1996 that Plemons considered Holiness to have made a number of improper purchase orders: First, in mid-May Holiness placed orders without approval from the customer, which subsequently had to be canceled. Second, on May 20, 1996, a problem arose with another customer's purchase order for a shipment of lumber. Holiness quoted to the customer a price for spruce, but the customer rejected the shipment upon delivery, claiming that he had ordered southern yellow pine, which is more expensive than spruce. Holiness asserts that he quoted a price for spruce because that is what the customer had requested, but Plemons's memorandum suggests that he believed that the customer had ordered southern yellow pine and that Holiness had simply erred. Ultimately, Moore-Handley supplied the customer with southern yellow pine at the price Holiness had quoted for spruce, which cost Moore-Handley over $1,000.00. Third, on June 13, 1996, Holiness purchased and shipped a load of "ungraded" lumber to a customer who expected it to be "graded," which cost Moore-Handley over $3,000.00. And finally, in late June 1996, Holiness issued a purchase order for a customer whose account was marked "Credit Hold," due to outstanding bills.

On June 20, 1996, Plemons called a meeting with Holiness, telling him that some of the vendors had complained that he was overly familiar with them on the phone. Holiness asked him which vendors had expressed displeasure, but Plemons refused to reveal that information. Plemons also told Holiness that the "main part" of the reason he was not receiving the $20,000 salary was the May 20, 1996 lumber order where Moore-Handley supplied southern yellow pine at the lower price for spruce quoted by Holiness. Holiness contends that aside from this June 20, 1996 meeting with Plemons, he was never advised that his job performance was less than satisfactory or that Moore-Handley had problems with any of his purchase orders, aside

from the May 20th lumber order.³ In response to Plemons informing him of the complaints, Holiness called the vendors he communicated with on a regular basis to question them about whether they had any problems with the way he was serving them. They told him that they did not have a problem and that he was doing a good job.

After Holiness received his next paycheck on June 28, 1996, he noticed that he was still receiving the $18,000-per-year rate, and he decided to speak with Moore-Handley's President, Bud White. White told Holiness that he had heard about the miscommunication regarding his salary but that he was being paid what he was supposed to be paid and that he should just stop worrying about his salary and do his job. Later that day, Plemons summoned Holiness to his office and told him that his employment with Moore-Handley was terminated. This termination decision was made by Plemons and was approved by Tolbert. On the form authorizing Holiness's removal from Moore-Handley's payroll Plemons wrote that he had terminated Holiness due to an "inability to do [his] job, lack of product knowledge, poor telephone mannerism (sic), customer complaints, [and] errors."

Five days later, Holiness filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Subsequently, Holiness filed his complaint in the United States District Court for the Northern District of Alabama, claiming that Moore-Handley violated the anti-discrimination and anti-retaliation provisions of Title VII and section 1981. More specifically, Holiness alleged that Moore-Handley (1) terminated his employment based upon racial discrimination; (2) terminated his employment in retaliation for his complaints about a perceived shortage in his pay and his association with white female employees; and (3) subjected him to a racially hostile work environment.⁴ In addition, Holiness appears to assert

---

³Plemons disputes this, claiming that he counseled Holiness on his alleged shortcomings on a number of other occasions.

⁴Holiness entitled Count III of his complaint, "State Tort Claims," without further exposition. During Holiness's deposition, his counsel acknowledged that Holiness is not asserting any claims against Moore-

in his brief that he might maintain a claim under 42 U.S.C. § 1983, to the effect that Moore-Handley violated his rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiff's Brief in Response at 7-8. Moore-Handley has filed a motion for summary judgment on all claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Id. at 323. The movant's burden is not meager; it must illuminate for the court the reasons why the non-movant cannot raise a genuine issue of material fact sufficient to support a trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to interrogatories, and

---

Handley premised upon state law. Holiness Depo. at 237.

admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. Celotex, 477 U.S. at 324; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). "Tenuous insinuation" and empty speculation based on loose construal of the evidence will not satisfy the non-movant's burden. Cf. Mesnick v. General Elec. Co., 950 F.2d 816, 820 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992).

While the court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the Rule "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting its claims. Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996). "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." Id. See also Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.) (en banc) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), cert. denied, 516 U.S. 817 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. Anderson, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" Tidwell v. Carter Products, 135 F.3d 1422, 1425 (11th

Cir. 1998) (citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989)).

### III. CONTENTIONS & ANALYSIS

#### A. The Racial Discrimination Claims under Title VII and Section 1981

Holiness claims that Moore-Handley allegedly discriminated against him on the basis of race in terminating his employment and thereby violated Title VII and section 1981. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 guarantees to all persons in the United States "the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Following the passage of the Civil Rights Act of 1991, the term "make and enforce contracts" is broadly defined as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship:" 42 U.S.C. § 1981(b). Thus, both Title VII and section 1981 prohibit an employer from discharging an employee on the basis of race, and both statutes require the same proof to show liability. Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Thus, the Court will address Holiness's Title VII discrimination claim with the express understanding that the analysis applies to his section 1981 discrimination claim as well. See id.

In this case, Holiness attempts to prove his claims of discrimination based upon circumstantial evidence.[5] When a plaintiff offers circumstantial evidence to prove a Title VII discrimination claim, courts use the analytical framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff must establish a prima facie case of discrimination. The establishment of a prima facie case

---

[5]Holiness has not presented direct evidence or statistical evidence of race discrimination, which are the other avenues by which he might have attempted to prove his Title VII discrimination claim. See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

creates a presumption of discrimination. The employer must then offer legitimate, nondiscriminatory reasons for the employment action to rebut the presumption. If the employer successfully rebuts the presumption, the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are pretextual. Id., at 802-04.

The first two steps of the McDonnell Douglas analysis are straightforward in this case. A Title VII plaintiff may establish a prima facie case of discriminatory discharge by demonstrating (1) that he is a member of a protected class, (2) that he was qualified for the position held, (3) that he was terminated, and (4) that he was replaced by a person outside the protected class. Coutu v. Martin County Bd. of County Com'rs, 47 F.3d 1068, 1073 (11th Cir. 1995). It appears that Moore-Handley is willing to assume for the purposes of summary judgment that there is sufficient evidence to establish a prima facie case of race discrimination under Title VII. The Court will similarly indulge in that assumption. Under the second step of McDonnell Douglas, Moore-Handley has satisfied its burden by presenting evidence indicating that it discharged Holiness based upon factors other than race: that he exhibited a general inability to his job, lacked product knowledge, had poor telephone etiquette, made a number of ordering errors, and that Moore-Handley received complaints about him from its customers and vendors. Thus, the initial presumption of discrimination drops from the case, and, as is so often the case, the viability of Holiness's discrimination claims will be determined at the third and final stage of the McDonnell Douglas analysis: pretext.

In order to survive summary judgment, Holiness must create a genuine issue of material fact as to whether the reasons advanced by Moore-Handley are pretextual. Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653, 658 (11th Cir. 1998) (citations omitted). In other words, Holiness must provide sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for his discharge. Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998). Holiness may do this (1) by showing that the legitimate nondiscriminatory reasons

should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). In this case, Holiness argues that the evidence indicates both that the legitimate nondiscriminatory reasons should not be believed and that race more likely motivated Moore-Handley's decision to terminate him.

Holiness first attempts to discredit Moore-Handley's claims that he committed errors on several purchase orders and that customers complained about him. Holiness contends that he was not counseled about many of the purchase order mistakes that Moore-Handley claims he made, and he says that he called the vendors with whom he dealt on a regular basis and they allegedly told him that they were satisfied with him. However, this is not substantial evidence indicating that Moore-Handley did not actually receive complaints about him or that Moore-Handley did not base its employment decision on such complaints or on its perception that Holiness was at fault for the problems arising from his purchase orders. Holiness seems to suggest that Moore-Handley simply concocted the customer complaints and placed them in his personnel file in order to have an excuse to terminate him, but this assertion is unsubstantiated; his assertions of his own good performance in the face of the documented deficiencies are insufficient to show that Moore-Handley's proffered reasons are pretextual. See Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997). Indeed, Holiness acknowledges that he sometimes used the familiar terms of address that were the basis for some of the complaints Moore-Handley claims it received. Holiness also admits that there was some misunderstanding regarding the May 20, 1996 lumber order that Moore-Handley maintains was the cause for other complaints, although Holiness denies that he was in any way at fault in that transaction. However, it might even be assumed that Holiness was not actually to blame for some or even all of the problems associated with the purchase orders in question. It is not a violation of federal employment discrimination laws for an employer to err in assessing the performance

of an employee. Moore v. Sears, Roebuck and Co., 683 F.2d 1321, 1323 n. 4 (11th Cir.1982). "Evidence showing a false factual predicate underlying the employer's proffered reason does not unequivocally prove that the employer did not rely on the reason in making the employment decision. Instead, it may merely indicate that the employer, acting in good faith, made the disputed employment decision on the basis of erroneous information. Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991)." Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., concurring specially) (further citation omitted). "[E]stablishing pretext is not merely demonstrating that the employer made a mistake [in its assessment of an employee's job performance or conduct], but that the employer did not given an honest account of its behavior." Id. (Footnote omitted). Holiness has not proven such was the case here, as there is no evidence indicating that Moore-Handley did not honestly believe that Holiness was to blame for the miscommunications with the purchase orders because he lacked sufficient knowledge of the products involved. See id., 53 F.3d at 1564-65 & n.7. A discharged employee may believe that he has been dealt with in a manner that is in some way unfair, but "Title VII is not a shield against harsh treatment at the workplace. . . . . The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (internal quotes and citations omitted).

Holiness also claims, however, that there is evidence indicating that Plemons and Tolbert, the two participants in the decision to terminate Holiness's employment, disliked an association or relationship between Holiness and Alysia Housey, a white female Moore-Handley employee.[6] He asserts that this evidence indicates that it was more likely than not that race

---

[6] The Court notes that the Court of Appeals for the Eleventh Circuit has expressly recognized that both Title VII and § 1981 prohibit discriminating against an employee based upon an interracial relationship or association of the employee. See Parr v. Woodmen of the World Life Ins. Co., 791 F.2d 888 (11th Cir. 1986).

motivated the employment decision. Specifically, Holiness points to the declaration of Housey, in which she asserts that her supervisor, Ann Lewis, commented "about management perception and how Robert Tolbert and Ed Plemons didn't like [Housey's] association with Glenn Holiness." Moore-Handley has moved to strike this portion of Housey's declaration, arguing that Housey's statement is "double hearsay" that is inadmissible under Fed. R. Evid. 802 and that it exhibits a lack of firsthand knowledge and is, therefore, also inadmissible under Fed. R. Evid. 602 and Fed. R. Civ. P. 56(e). However, assuming for the sake of argument that this evidence may be considered with the motion for summary judgment,[7] the Court concludes that, even if credited, it is not sufficiently probative to indicate that Holiness was terminated

---

[7]Moore-Handley argues that Housey's statement that Lewis told her that Tolbert and Plemons "didn't like" Housey's relationship with Holiness is "double hearsay." However, the Court would note that Housey's statement is not "double hearsay" because Housey does not testify that Lewis repeated any statements allegedly made by Tolbert or Plemons. Indeed, it appears that if Lewis repeated to Housey statements allegedly made by Tolbert or Plemons to the effect that they disapproved of a relationship between Housey and Holiness, Housey's statement would not be objectionable on hearsay grounds because each level of alleged hearsay ((1) Lewis to Housey and (2) Tolbert and Plemons to Lewis) would constitute admissions of a party opponent because Lewis, Tolbert, and Plemons were each supervisory employees and would be making statements about matters concerning employees under their supervision; thus the statements would be excluded from the definition of hearsay under Fed. R. Evid. 801(d)(2)(D). See City of Tuscaloosa v. Harcros Chemicals, 158 F.3d 548, 557-58 (11th Cir. 1998); Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1456 (11th Cir. 1997) ("[S]tatements made by a supervisory official who plays some role in the decision making process are generally admissible" under Rule 801(d)(2)(D)). See also Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 134 (3rd Cir. 1997); Bevan v. Honeywell, Inc., 118 F.3d 603, 611 (8th Cir. 1997); Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1238 n.1 (2nd Cir. 1995); King v. Auto, Truck, Industrial Parts and Supply, Inc., 21 F.Supp. 2d 1370, 1381 n.9 (N.D. Fla. 1998) (all holding that statements allegedly constituting hearsay within hearsay were admissible where both layers constituted admissions under Fed. R. Evid. 801(d)(2)(D)).

Moore-Handley also contends that Housey's statement is inadmissible because it is not made upon personal knowledge, in violation of Fed. R. Evid. 602 and Fed. R. Civ. P. 56(e). However, it is obvious that Housey would have personal knowledge of the fact to which she testifies: that Lewis made a statement to her that Tolbert and Plemons "didn't like" Housey's association with Holiness. Moreover, it has been held that the personal knowledge requirement of Fed. R. Evid. 602 does not apply to admissions excepted from the definition of hearsay under Fed. R. Evid. 801(d)(2)(D). See Brookover v. Mary Hitchcock Memorial Hosp., 893 F.2d 411, 415-418 (1st Cir. 1990). There may be some potential admissibility problems with Housey's statement, however, given that the basis of Lewis's knowledge of Tolbert and Plemons's alleged disapproval of an association between Housey and Holiness is entirely unclear. However, the Court will assume for the purposes of summary judgment that Housey's statement is admissible and will consider it for what it is worth.

based upon racial considerations, in light of all the other evidence in the case. First, Holiness has not produced evidence undercutting Moore-Handley claims that it received customer and vendor complaints about his lack of product knowledge and familiar terms of address and that it assessed Holiness's job performance as inadequate. Second, it is entirely unclear what might be Lewis's basis of knowledge for stating that Tolbert and Plemons "didn't like" an association between Holiness and Housey. Did Tolbert or Plemons actually make a statement to that effect? Or does Lewis statement merely reflect an unsubstantiated belief on her part regarding the mental operations of Tolbert and Plemons? On this issue the record is silent, as there is no affidavit or deposition testimony from Lewis. Third, even assuming Tolbert and Plemons may not have "liked" an association between Housey and Holiness, it does not necessarily follow that such disapproval was based upon racial considerations, as opposed to, for example, the fact that Housey was married and Holiness was engaged. "Isolated and ambiguous comments 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of [unlawful] discrimination.'" <u>Phelps v. Yale Sec., Inc.</u>, 986 F.2d 1020, 1025 (6th Cir.) (<u>quoting</u> <u>Gagne v. Northwestern Nat'l Ins. Co.</u>, 881 F.2d 309, 314 (6th Cir. 1989)), <u>cert. denied</u>, 510 U.S. 861 (1993). Housey does claim that, at some unspecified time, Tolbert "confronted" her about having a conversation with another black male employee, but even that episode is highly ambiguous, as Housey alleges that Tolbert merely asked her how she knew that employee and "several other" unspecified questions that Housey considered "personal" in nature. And fourth, Holiness admits that neither Tolbert nor Plemons ever made any statement to him about his relationship with Housey or any other employee or indicating a racial bias. Based upon the foregoing, the Court concludes that Holiness has not produced sufficient evidence to indicate that Moore-Handley's proffered reasons for his discharge were a pretext for racial discrimination. Accordingly, the Court holds that Moore-Handley's motion for summary judgment is due to be granted with respect to Holiness's discrimination claims under Title VII and section 1981.

B.  The Retaliation Claims under Title VII and Section 1981

Holiness also contends that Moore-Handley violated the anti-retaliatory provisions of Title VII and section 1981.  More specifically, Holiness alleges that Moore-Handley did so by allegedly firing him (1) because of his complaints about the perceived discrepancy between the salary he was receiving and the amount he claims Hardin told him he would earn if he took that job and (2) because he associated with Housey, a white female co-worker.  Moore-Handley claims that it is entitled to summary judgment on these retaliation claims because neither his complaints about his pay nor his association with a white employee constitutes activity that is protected under either Title VII or section 1981.

The statutory provision of Title VII that Holiness asserts prohibited Moore-Handley from terminating his employment based upon his pay complaints and his association with Housey is 42 U.S.C. 2000e-3(a), which recognizes two types of statutorily protected conduct.  An employee is protected from discrimination if (1) "he has opposed any practice made an unlawful employment practice by [42 U.S.C. § 2000e]" (the opposition clause) or (2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [42 U.S.C. § 2000e]" (the participation clause).  The United States Court of Appeals for the Eleventh Circuit has held that retaliation claims, in a racial discrimination context, arising after the effective date of the 1991 Civil Rights Act are generally cognizable under section 1981.  See Andrews v. Lakeshore Rehabilitation Hosp., 140 F.3d 1405, 1409-13 (11th Cir. 1998).  Because Holiness pursues his Title VII and section 1981 retaliation claims as parallel causes of action, the Court will consider his Title VII retaliation claim with the understanding that such analysis applies with equal force to his section 1981 retaliation claim, as the Court did above with Holiness's discrimination claims.  See Standard, 161 F.3d at 1330; Sullivan v. National R.R. Passenger Corp., 170 F.3d 1056, 1058-61 (11th Cir. 1999) (treating the sufficiency of the evidence to sustain a retaliation claim brought under Title VII and section 1981 with a single analysis).

In order to sustain a retaliation claim under Title VII, a plaintiff must prove that he engaged in some statutorily protected activity. See, e.g., Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999). In this case, Holiness has not done so. There is no dispute that Holiness complained about his pay to supervisors at Moore-Handley. Moreover, Title VII and 1981 prohibit employers from discriminating in compensation based upon race, and, accordingly, complaints to an employer in opposition to such discrimination are considered protected activity for the purposes of establishing a retaliation claim. However, what Holiness complained about was a perceived disparity between the amount of his paycheck and the amount he believed Hardin told him he would receive if he took the position. He does not assert that he complained to anyone at Moore-Handley about an alleged disparity in pay between either himself and a white employee doing similar work or between black and white employees generally. Nor does he contend that he voiced to anyone at Moore-Handley that his race was the reason that he was not being paid what Hardin allegedly promised to him if he took the job. Thus, there is nothing to indicate that Holiness ever injected the element of race into his complaints to Moore-Handley about his pay. If an employer promises to pay his employee a certain sum for work to be performed and then pays him a lesser amount, such would be wrongful and might give rise to a claim under state law for breach of contract. However, such a misrepresentation does not constitute racial discrimination under Title VII or section 1981, notwithstanding that the employee in question happens to be black. Accordingly, complaints about such misrepresentations do not amount to opposition to racial discrimination and are not statutorily protected under the anti-retaliatory provisions of Title VII or section 1981. See Hill v. Pinkerton Sec. & Investigation Services, Inc., 977 F.Supp. 148, 157-58 (D. Conn. 1997) (holding that the plaintiff failed to establish a prima facie case of retaliation under a state law retaliation claim with the same requirements as a Title VII retaliation claim where there was no evidence indicating that complaints about a pay differential related to the plaintiff's race or sex).

Similarly, Holiness's association with Housey does not constitute protected activity for

purposes of establishing a <u>retaliation</u> claim under Title VII or section 1981. It is true that allegations that an employer has adversely treated an employee based upon the employee's relationship or association with a person of another race will give rise to a claim under the <u>anti-discrimination</u> provisions of Title VII and section 1981. See <u>Parr v. Woodmen of the World Life Ins. Co.</u>, 791 F.2d 888 (11th Cir. 1986). However, in order to succeed on his retaliation claims here, Holiness must present evidence indicating that he either voiced some <u>opposition</u> to race discrimination or <u>participated</u> in some proceeding concerning an allegation of race discrimination. The mere association with an employee of another race, standing alone, simply is neither opposition nor participation, and it cannot give rise to a retaliation claim under either Title VII or section 1981. Accordingly, the Court concludes that Moore-Handley is entitled to summary judgment on Holiness's retaliation claims under Title VII and section 1981.

<u>C. The Racially Hostile Work Environment Claims under Title VII and Section 1981</u>

Title VII of the Civil Rights Act of 1964 provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Section 42 U.S.C. 2000e-2(a)(1). The Supreme Court of the United States has held that this not only covers "terms" and "conditions" in the narrow contractual sense, but "evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment." <u>Oncale v. Sundowner Offshore Services, Inc.</u>, 118 S.Ct. 998, 1001(1998), <u>quoting</u> <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 64 (1986) (citations and internal quotation marks omitted). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993) (citations and internal quotation marks omitted). The United States Court of Appeals for the Eleventh Circuit has stated that it reads section 1981, as amended by the Civil Rights Act of

1991, to encompass claims for a racially hostile work environment, under the same standards applicable to such claims under Title VII. See Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1008 n.17 (11th Cir. 1997). Once again, the Court will expressly consider Holiness's hostile work environment claim in the context of Title VII, but the analysis also applies to his parallel claim brought under section 1981.

In order to prevail on a racially hostile work environment under Title VII, a plaintiff must "'demonstrate that the actions of the defendants altered the condition of the workplace, creating an objectively abusive and hostile atmosphere.'" Jackson, 130 F.3d at 1008 n.17, quoting Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995). The harassment must be both subjectively and objectively offensive--the plaintiff must show both that a reasonable person would find the environment "hostile or abusive" and that she actually did find the environment to be offensive. Harris, 510 U.S. 17, 21. The Supreme Court has "directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Faragher v. City of Boca Raton, 118 S.Ct. 2275, 2283 (1998), quoting Harris, 510 U.S. at 23.

In this case, the summary judgment evidence indicates that Holiness did not endure a workplace that was sufficiently abusive, in either an objective or subjective sense, to sustain his hostile work environment claim. The most overt racial hostility Holiness claims he endured was that on two occasions he was subjected to racial epithets, but both times he concedes the situation was immediately remedied. First, while Holiness was still working in the warehouse after beginning his second stint of employment with Moore-Handley, an unnamed co-employee called him "black monkey." Holiness became "highly upset" and reported the incident to his supervisor, who told the co-employee to stay on the other end of the warehouse and to "leave Glenn alone," and Holiness never experienced a problem with the co-employee again. Second,

after Holiness had begun working in commodities sales, Hardin addressed him as "boy" twice in one day in a manner that offended Holiness. However, Holiness advised Hardin that he did not appreciate the term, and the next day Hardin offered an apology to Holiness, which was accepted. These isolated racial remarks are not in themselves sufficient to establish a claim of a racially hostile work environment. The "'mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' does not affect the terms, conditions, or privileges of employment to a sufficiently significant degree" so as to constitute an actionable hostile work environment. Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982), quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971).

Indeed, it seems that Holiness attempts to found his hostile work environment claim primarily upon harassment Alysia Housey allegedly endured because of her associations with Holiness and other black males. He cites her declaration and points to her allegations that she heard negative comments about her association with black males and that her supervisor, Ann Lewis, warned her that she could lose her job because of it. Such evidence more directly indicates that Housey might have been subjected to a hostile work environment, but Holiness cannot recover for the harassment allegedly suffered by his co-employee. Holiness does state that Housey told him that Lewis had warned her that she could lose her job and family because of her relationship with Holiness and that another female employee, Dori Smith, had told him that unspecified people were "talking" about his being fired because of his association with Housey. Thus, these incidents are relevant to Holiness's harassment claim, but they fall short of the severe and pervasive harassment required to establish a hostile work environment under Title VII. Indeed, the evidence also shows that Holiness did not subjectively consider his workplace to be sufficiently hostile: Holiness characterized the racial animosity at Moore-Handley as "very subtle," and he offered that he "would not necessarily say [that the environment was] hostile." Holiness Depo. at 232-33. Thus, the Court concludes that Moore-Handley is entitled to summary judgment on Holiness's hostile work environment claims under

Title VII and section 1981.

## CONCLUSION

Based on the foregoing, the Court concludes that there are no genuine issues of material fact and Moore-Handley is entitled to judgment as a matter of law on all of Holiness's claims under Title VII and section 1981. Holiness's discrimination claims failed because he did not present substantial evidence indicating that Moore-Handley's proffered reasons for terminating him were merely pretexts for race discrimination. The evidence further indicates that Holiness cannot maintain his retaliation claims because the undisputed evidence shows that he did not engage in statutorily protected activity by complaining about a perceived shortage in his pay or by associating with white employees. And finally, the evidence is not sufficient to allow a finding that Holiness was subjected to a workplace that was sufficiently abusive in an objective sense to sustain his hostile work environment claims, and the undisputed evidence further shows that Holiness did not consider his workplace at Moore-Handley to be sufficiently hostile. Even if the evidence that Moore-Handley sought to exclude by its motion to strike is considered, Moore-Handley's motion for summary judgment (Doc. 14) is due to be GRANTED and the motion to strike (Doc. 23) is due to be DENIED AS MOOT. Thus, the case is due to be DISMISSED WITH PREJUDICE. A separate Order will be entered contemporaneously herewith.

DONE and ORDERED this 23rd day of June 1999

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE